**Garbis DAVOYAN, et al., individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**REPUBLIC OF TURKEY, et al., Defendants.**

**Case No. CV 10–05636 DMG (SSx)**

United States District Court, C.D. California.

Signed March 26, 2013

Ara Ray Jabagchourian, Cotchett Pitre Simon and McCarthy, Burlingame, CA, Berj Boyajian, Boyajian And Associates, Brian S. Kabateck, Richard L. Kellner, Scott Matthew Malzahn, Kabateck Brown Kellner LLP, Mark John Geragos, Shelley Lynn Kaufman, Los Angeles, CA, Karen Liao, Manning and Kass Ellrod Ramirez Trester LLP, Los Angeles, CA, for Plaintiffs.

Christopher Paul Murphy, Matthew Henry Marmolejo, Neil M. Soltman, Mayer Brown LLP, Los Angeles, CA, David Saltzman, Saltzman & Evinch PC, Washington, DC, for Defendants.

## ORDER RE BANK DEFENDANTS' (1) MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS, AND (2) MOTION TO CONSOLIDATE CASES [42,48]

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

Plaintiffs' claims concern the plight of Armenians living within the Ottoman Empire during its waning years. The Court must now decide whether it has jurisdiction under the Foreign Sovereign Immunities Act and, if so, whether other considerations nonetheless warrant dismissal. Having duly considered the respective positions of the parties, as presented in their

briefs and at the December 19, 2011 oral argument, the Court now renders its decision. For the reasons set forth below, Defendants' motion to dismiss is GRANTED and Defendants' motion to consolidate cases is DENIED as moot.

## I.

### PROCEDURAL HISTORY

On July 29, 2010, Plaintiffs Garbis Davoyan and Hrayr Turabian filed a class action complaint against Defendants Republic of Turkey, the Central Bank of the Republic of Turkey, and T.C. Ziraat Bankasi, asserting the following causes of action: (1) constructive trust; (2) breach of statutory trust; (3) unjust enrichment; (4) accounting; and (5) human rights violations and violations of international law. Plaintiffs seek to represent a class of Armenians and former Turkish citizens—or their heirs, beneficiaries, and assigns—who were deprived of citizenship, deported, and had their property seized and expropriated by the Republic of Turkey or its predecessor government under the Ottoman Empire.

Although Central Bank and Ziraat (the "bank defendants") dispute that they were properly served [Doc. # 14], the Court ruled that service substantially complied with the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(b)(2), and that service was therefore proper [Doc. # 22]. In addition, the Court stayed the case until Plaintiffs served the Republic of Turkey on July 8, 2011 [Doc. # 35]. The bank defendants filed their answer on September 6, 2011 [Doc. # 36], and the Court entered default against the Republic of Turkey on October 11, 2011 [Doc. # 43].

On October 7, 2011, Central Bank and Ziraat filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for judgment on the pleadings [Doc. # 42]. On November 3, 2011, the bank defendants moved to consolidate this action with a case involving related issues, *Bakalian v. Republic of Turkey*, No. CV 10–09596 DMG (SSx) (filed Dec. 15, 2010) [Doc. # 48].

## II.

### FACTUAL ALLEGATIONS [1]

In 1914, before World War I, there were an estimated two million Armenians in the Ottoman Empire. While the Armenian population in Eastern Anatolia (also called Western Armenia) was large and clustered, large numbers of Armenians also lived in the western part of the Ottoman Empire. The Armenians, many of whom were landowners and farmers, had lived in these areas for centuries. (Compl. ¶ 23.)

Until the late 19th century, the Ottomans referred to these Armenians as *millet-i sadika* ("loyal nation"). This meant that they lived in harmony with other ethnic groups without any major conflict with the central authority. The Christian Armenians were subject to laws that afforded them fewer legal rights than fellow Muslim citizens. The Armenians also enjoyed privileges, however, such as exemption from conscription into the army. The Tanzimat ("Regulations") government gave more rights to the minorities in the middle of the 19th century. Yet, the long-ruling Sultan Hamid suspended the constitution early in his reign and ruled as he saw fit. Despite pressure on the Sultan by the

---

1. The Court summarizes the factual allegations in Plaintiffs' complaint, which appear to be copied without attribution from the New World Encyclopedia entry on "Armenian Genocide." *Compare* (Compl. ¶¶ 23–38) *with* http://www.newworldencyclopedia.org/entry/ Armenian_Genocide. That entry, in turn, was copied from the Wikipedia entry on "Armenian Genocide" that existed as of July 22, 2006. *See* http://en.wikipedia.org/w/index. php?title=Armenian_Genocide & oldid=65254992.

major European countries to treat the Christian minorities more gently, abuses increased. (*Id.*¶ 24.)

Following Russia's victory over the Ottoman Empire in the War of 1877–78, the Russians took control of a large part of Armenian territory. Having proven themselves militarily superior to the Ottomans, the Russians claimed to be the protectors of Christians within the Ottoman Empire. During the next 15 years, the Ottoman government's weakening control over its empire led many Armenians (as well as Greeks, Romanians, Serbians, and Balkans) to believe that they could gain independence. (*Id.*¶ 25.)

In 1894, a minor unrest by Armenians in Bitlis Province was brutally suppressed. Over the next three years, Armenian communities suffered a series of attacks, resulting in the deaths of an estimated 80,000 to 300,000 Armenians. (*Id.*¶ 26.)

Five years before the outbreak of World War I, the Ottoman Empire came under the control of the secular *ttihad ve Terakki* ("Committee of Union and Progress"—also known as "Young Turks"), which deposed Sultan Hamid and installed his younger brother Mehmed V as a figurehead ruler. Real power, however, resided with Ismail Enver (Enver Pasha). At first, some Armenian political organizations supported the Young Turks in the hope that they would foment significantly better Ottoman–Armenian relations. Armenians were among those elected to the newly restored Ottoman Parliament. (*Id.*¶ 27.)

In July 1914, the *ttihad ve Terakki* founded a "special organization" that participated in events that led to the destruction of the Ottoman Armenian community. This organization differed from a preexisting "special organization" in that it was meant to be a "government within a government" and needed no orders to act. (*Id.*¶ 28.) Later in 1914, the Ottoman government decided to influence the direction

the special organization was to take by releasing criminals from prisons to be the central elements of this newly formed special organization. From the end of 1914 to the beginning of 1915, thousands of prisoners were freed to form this organization's membership. Later, they were charged to escort convoys of Armenian deportees. (*Id.*¶ 29.) The special organization was led by four Central Committee members, three of whom operated in Istanbul where their decisions were approved and implemented by the Military Governor of Istanbul. (*Id.*¶ 30.)

On May 25, 1915, the Minister of the Interior, Talat Pasha, issued orders to forcibly evacuate hundreds of thousands of Armenians–possibly more than one million—from Anatolia to Mesopotamia and present-day Syria. Many went to the Syrian town of Dayr az-Zawr and the surrounding desert. (*Id.*¶ 31.) The Ottoman government also ordered the evacuation or deportation of many Armenians living in Syria and Mesopotamia. In early 1916, Armenians in the city of Edessa (modern-day anlurfa), worried about their fate, revolted against the Ottoman government and took control of the old city. Ottoman forces attacked the city and bombarded it with artillery but the Armenians resisted. Baron von der Goltz, the German general in command of the closest Ottoman army to the city, arrived and negotiated a settlement with the Armenians, in which the Ottoman government agreed not to deport the Armenians in exchange for their surrender and disarmament. Nonetheless, the Ottoman government broke the terms of the agreement and deported the Armenians. (*Id.*¶ 32.)

The Ottoman Empire maintained a policy of deporting, persecuting and exterminating Armenians to finance its participation in World War I. It collected the looted assets in central depositories and

collected profits from the lands and businesses that it confiscated. The assets were first transferred to the state treasury and then to the Central Bank, agencies, and other organizations controlled by the government. (*Id.*¶ 39.) More than one million Armenians were liquidated in forced marches, concentration camps, and general massacres that were perpetrated, assisted, and condoned by Turkish officials and armed forces. (*Id.*¶ 40.)

On May 24, 1915, the Triple Entente publicly announced that the Allied governments would hold the Ottoman government and its agents personally responsible for massacres and other crimes against humanity. (*Id.*¶ 33.) Following the Armistice of Mudros in October 1918,[2] the preliminary peace conference in Paris established the Commission on Responsibilities and Sanctions. The commission's work resulted in the addition of several articles to the Treaty of Sèvres, which recognized Armenia as an independent state and contemplated a mechanism for prosecuting war criminals.[3] (*Id.* ¶ 34.) Article 230 required the Ottoman Empire, "to hand over to the Allied Powers the persons whose surrender may be required by the latter as being responsible for the massacres committed during the continuance of the state of war on territory which formed part of the [Ottoman] Empire on August 1, 1914." (*Id.*¶ 35.) The Ottoman Empire's acting heads of government, Sultan Mehmed VI and Damat Adil Ferit Pasha, were brought to trial. (*Id.*¶ 34.)

At the 1919 military trials in Istanbul, many of those responsible for the genocide were sentenced to death in absentia after having escaped trial in 1918. Before their escape, the accused destroyed the majority of the documents that could have been used as evidence against them. (*Id.*¶ 36.) The military court established that the *ttihad ve Terakki* intended to eliminate the Armenians physically, via its special organization. (*Id.*¶ 37.)

Following the end of World War I, the Republic of Turkey maintained a policy of eradicating the remnants of the Ottoman Empire's Armenian population and finalizing the expropriation of their public and private properties. It did this in order to benefit from the enormous wealth that had been expropriated by the Ottoman government, its agencies, and authorized individuals. The confiscations included businesses, bank deposits, houses, churches,

---

**2.** Plaintiffs allege that the Armistice of Mudros occurred in January 1919. (Compl.¶ 33.) The Court takes judicial notice under Federal Rule of Evidence 201(b)(2) that the armistice was actually reached at the end of October 1918. *See, e.g.,* William L. Cleveland & Martin Bunton, *A History of the Modern Middle East* 153 (4th ed.2009).

**3.** Although Plaintiffs' allegations regarding the Treaty of Sèvres constitute legal conclusions rather than factual allegations, they are accurate. In Article 88, the Ottoman Empire "recognize[d] Armenia as a free and independent state." *See* Treaty of Peace Between the Allied and Associated Powers and Turkey (Treaty of Sèvres), Aug. 10, 1920, B.T.S. No. 11 (1920), *reprinted in* 15 Am. J. Int'l Law 179 (Supp.1921). Section VII (Articles 226 through 230) required the Ottoman Empire to hand over war criminals and evidence of war crimes and to recognize and comply with anticipated tribunals that would punish those responsible for the wartime massacres. Nonetheless, the Treaty of Sèvres—which the United States did not sign—was short-lived. The Turkish national movement led by Mustafa Kemal Atatürk opposed the treaty and, after it successfully consolidated power during the Turkish war of independence that followed in the wake of World War I, the new Turkish government forced the Allied Powers to renegotiate the terms of peace with Turkey. The resultant 1923 Treaty of Lausanne—which the United States also did not sign—largely replaced the Treaty of Sèvres. *See* Carter Vaughn Findley, *Turkey, Islam, Nationalism, and Modernity: A History, 1789–2007* 219–26 (2010); Cleveland & Bunton, *supra* note 2, at 176–78.

and vast amounts of land. To consolidate and further benefit from these confiscations, Turkey took legislative and physical actions to confiscate even more properties. (*Id.* ¶ 42.)

Turkey adopted laws and regulations governing "abandoned" property—real and personal—which provided that the Turkish government would administer the property, collect rents and sale proceeds, and deposit such funds in the government treasury in trust in the name of the owners of such property.[4] These laws and regulations provided that the Turkish treasury would hold such funds for the benefit of the property owners and would restore the property to them. (*Id.* ¶ 44.) Although the ostensible purpose of the abandoned property laws was to protect the Armenian property, Turkey deliberately ignored the laws. (*Id.* ¶ 43.)

Plaintiffs are the grandsons of two individuals who owned property in Turkey.[5] They seek to certify a class defined as follows:

a. all persons of Armenian ethnicity (or if deceased, their heirs and assigns) who are residents of the United States;

b. who owned real property located in the [Republic of Turkey] in 1915;

c. who were deported and relocated from Turkey between 1915 [and] 1923; and

d. whose real property in the [Republic of Turkey], after their relocation, was expropriated by the [Republic

of Turkey] for its use or for use by others.

(*Id.* ¶ 58.)

In their first three causes of action—for constructive trust, breach of statutory trust, and unjust enrichment—Plaintiffs seek to recover the property confiscated from them by the Turkish government as well as any rents and profits derived from it. Plaintiffs request an accounting of this property in their fourth cause of action. Plaintiffs' fifth cause of action—for "human rights violations and violations of international law"—does not identify any specific relief sought. In their prayer for relief, however, Plaintiffs request a declaration that "the profits, rents and property illegally confiscated, controlled and disposed of by the Defendants were obtained through systematic persecution, extermination, deportation, torture, force and murder [and] violated international treaties and customary international law enforceable in this Court as federal common law, the law of nations and international law." (*Id.* at 22.)

### III.

### SUBJECT MATTER JURISDICTION

▆▆▆ : The bank defendants move to dismiss this action for lack of subject matter jurisdiction. (Mot. at 3–7.) In resolving a facial attack on jurisdiction, the Court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of Plaintiffs. *See Doe v. Holy See*, 557 F.3d 1066, 1073

---

4. Plaintiffs do not identify the specific laws to which they refer. For the purpose of resolving the bank defendants' motion, the Court assumes without deciding that Plaintiffs' description of Turkish law is correct.

5. As the bank defendants point out, Plaintiffs do not allege that they are the *heirs* to their grandfathers' properties. Nor, for that mat-

ter, do Plaintiffs even allege that their grandfathers were deported and relocated from Turkey between 1915 and 1923 such that they would be members of the putative class. For the purpose of resolving Defendants' motion to dismiss and motion for judgment on the pleadings, the Court assumes that Plaintiffs could successfully amend their complaint to include such allegations.

(9th Cir.2009) (*per curiam* ) (citing *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)). The Court does not assume the truth of legal conclusions, even if "cast in the form of factual allegations." *Id.* (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003)) (internal quotation mark omitted).

Plaintiffs assert subject matter jurisdiction under the FSIA, 28 U.S.C. § 1330(a). This statute vests district courts with original jurisdiction over nonjury civil actions against a "foreign state"—a term which includes the foreign state's agencies and instrumentalities—so long as the state is not entitled to immunity under the FSIA or an applicable international agreement.[6] 28 U.S.C. §§ 1330(a), 1603(a). A foreign state is immune except as provided by the FSIA. *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1026–27 (9th Cir.2010) (*en banc* ) (citing 28 U.S.C. § 1604).

 The Ninth Circuit employs a burden-shifting scheme in analyzing FSIA jurisdiction. To trigger the FSIA's statutory presumption of immunity, a defendant must make a *prima facie* case that it is a foreign state. *Peterson v. Islamic Republic Of Iran*, 627 F.3d 1117, 1124 (9th Cir. 2010) (citations omitted). Once the defendant establishes that it is a foreign state, "the burden of production shifts to the plaintiff to offer evidence that an exception applies." *Phaneuf v. Republic of Indonesia*, 106 F.3d 302, 307 (9th Cir.1997) (citing *Randolph v. Budget Rent-A-Car*, 97 F.3d 319, 324 (9th Cir.1996)). If the plaintiff satisfies the burden of production, then "jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Peterson*, 627 F.3d at 1125 (citations omitted).

As alleged in the complaint, both bank defendants are instrumentalities of the Republic of Turkey.[7] As such, the bank defendants are presumptively entitled to immunity. Plaintiffs contend that two of the FSIA's exceptions to immunity apply–the commercial activity exception,[8] 28 U.S.C. § 1605(a)(2), and the expropriation exception, *id.* § 1605(a)(3). The Court considers each of these contentions in turn.

---

**6.** Plaintiffs' complaint includes a demand for a jury trial. (Compl. at 1.) To the extent this demand destroys jurisdiction, the Court assumes without deciding that the defect is curable.

**7.** Plaintiffs argue for the first time in their opposition brief that "Ziraat is a private banking enterprise" and "raises no independent argument as to how a private bank can even begin to assert sovereign immunity." (Opp'n at 5.) Yet, this flatly contradicts the allegations in their complaint. (*See* Compl. ¶¶ 6 ("[The Republic of Turkey] is a nation whose agencies largely control and own many of the instrumentalities of the economy including ... Ziraat.... "), 17 ("Ziraat was a state institution and since 1924 is a joint stock company in which the Treasury of the [Republic of Turkey] is the sole shareholder.").) Moreover, Plaintiffs previously represented to the Court that "Central Bank and Ziraat Bank are foreign instrumentalities under the Foreign Sovereign Immunities Act." (Opp'n to Nov. 1, 2010 Mot. to Dismiss [Doc. # 19] at 3.) As explained below, the dismissal of this action is not for want of subject matter jurisdiction. Thus, the Court need not consider whether Plaintiffs could successfully amend their complaint to allege an alternative basis for jurisdiction over Ziraat.

**8.** The bank defendants fault Plaintiffs for first raising the commercial activity exception in their opposition brief. (Reply re Mot. to Dismiss [Doc. # 52] at 1.) As set forth above, Plaintiffs' burden to demonstrate an FSIA exception is triggered when Defendants assert immunity. *See Peterson*, 627 F.3d at 1124. Defendants first did so in their motion to dismiss. It was thus proper for Plaintiffs to respond by invoking the commercial activity exception in their opposition.

## A. Commercial Activity Exception

Under the "commercial activity" exception, a foreign state is not immune from United States jurisdiction in any case

in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....

28 U.S.C. § 1605(a)(2).

■ A "commercial activity" is "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). A foreign state engages in commercial activity "only where it exercises 'those powers that can also be exercised by private citizens,' or when it acts 'in the manner of a private player within the market,' but not when it exercises those powers 'peculiar to sovereigns.'" *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1132 (9th Cir.2012) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993)). Thus, where the defendant's conduct "is in substance a taking of property"—a quintessentially government action—"it should be considered only under the takings exception of section 1605(a)(3)." *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1106 (9th Cir.1990), *(abrogated on other grounds, Samantar v. Yousuf*, 560 U.S. 305, 130 S.Ct. 2278, 176 L.Ed.2d 1047 (2010)).

■ In determining whether an activity is "commercial" in character, courts must focus on the nature of the course of conduct or particular transaction or act, rather than its purpose. *Terenkian*, 694 F.3d at 1132–33 (quoting *Nelson*, 507 U.S. at 359, 113 S.Ct. 1471). The relevant question "is whether the particular actions that the foreign state performs ... are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* (quoting *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir.2010)) (internal quotation marks omitted).

The commercial activity exception contains three independent clauses, and courts evaluating these clauses apply different criteria to each. *Id.* at 1126–27 (citations omitted). Plaintiffs maintain that each applies to their claims.

### 1. Clause One

■ The first clause of 28 U.S.C. § 1605(a)(2) excepts sovereign immunity from a case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." In order for a foreign state to lose its immunity under this clause, "the foreign state's commercial activity in the United States must be the basis of (i.e., a necessary element of) the plaintiff's claim" and "the commercial activity must be significant and have substantial contact with the United States." *Terenkian*, 694 F.3d at 1133.

■ Plaintiffs contend that their claims have a United States nexus because Defendants commingled the funds sought by Plaintiffs with funds in the United States, where the commingled funds were then used to carry out business. (Opp'n at 5.) Yet, the fact that the foreign sovereign "regularly conducts other commercial activity in the United States" is insufficient to abrogate sovereign immunity under the first clause of 28 U.S.C. § 1605(a)(2) "if that activity 'has no connection with, or relationship to,' the conduct which gave rise to plaintiff's cause of action.'" *Terenkian*, 694 F.3d at 1133 (quoting *Gen. Elec. Capital Corp. v. Grossman*, 991 F.2d 1376,

1383 (8th Cir.1993)). "There must be a nexus between the defendant's commercial activity in the United States and the plaintiff's *grievance.*" *Am. W. Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793, 796 (9th Cir.1989) (emphasis added) (citing *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Court,* 859 F.2d 1354, 1360 (9th Cir. 1988)); *see also* James Cooper-Hill, *The Law of Sovereign Immunity and Terrorism* 72 (2006) ("A foreign state . . . does not abrogate its sovereign immunity simply because it conducts commercial operations that have some connection with the United States. The FSIA is not a general long-arm statute conferring subject matter jurisdiction against a nonresident defendant on the basis of his 'doing business' in the State.").

 An action is "based upon" a commercial activity carried on in the United States when the commercial activity in the United States gives rise to "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson,* 507 U.S. at 357, 113 S.Ct. 1471 (citing *Callejo v. Bancomer, S.A.,* 764 F.2d 1101, 1109 (5th Cir.1985)). Here, that is not so. Plaintiffs need not prove that Defendants engaged in commercial activity in the United States using commingled funds to demonstrate their entitlement to the funds. Accordingly, the first clause of 28 U.S.C. § 1605(a)(2) does not apply.

### 2. Clause Two

The second clause of the commercial activity exception applies when "the action is based upon . . . an act performed in the United States in connection with a commercial activity of the foreign state else-

where." 28 U.S.C. § 1605(a)(2). Plaintiffs assert that Central Bank "distributes monies gained illicitly from the confiscations to Turkey's Ministry of Tourism, which operates offices in [the United States] for purposes of soliciting U.S. tourism dollars." [9] (Opp'n at 6.) Even if true, this fact is immaterial to jurisdiction.

 To invoke the second clause of 28 U.S.C. § 1605(a)(2), "[a] plaintiff must either demonstrate a causal connection between a sovereign's actions in the United States and those abroad giving rise to the plaintiff's claims, or the sovereign's acts in the United States must themselves represent an element in the plaintiff's cause of action." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 709 (9th Cir.1992) (citing *Gilson v. Republic of Ireland,* 682 F.2d 1022, 1027 n. 22 (D.C.Cir.1982)). The Ministry of Tourism's solicitation of United States residents to travel to Turkey is neither an element of Plaintiffs' claims nor causally connected to them. To the extent Plaintiffs maintain that the Ministry of Tourism's activities in the United States are materially connected to Central Bank's confiscation of their property in Turkey, the confiscation of property is not a commercial activity. Only a government can exercise the power of eminent domain or pass laws regulating property. *Cf. Chuidian,* 912 F.2d at 1106.

*Siderman,* on which Plaintiffs rely, is thus distinguishable. It did not involve the use of commingled funds in the United States in ways that were wholly unrelated to the plaintiffs' claims. Rather, it concerned a hotel that the Argentine government had taken from the plaintiffs. The plaintiffs claimed that the tourism revenue earned by Argentina from the hotel right-

---

**9.** Plaintiffs also claim that Central Bank uses monies gained from confiscated lands and property to operate Turkish Airlines in the United States. (Opp'n at 6.) This assertion appears to fit under the *first* clause of 28

U.S.C. § 1605(a)(2), as it involves a commercial activity in the United States. It is insufficient to establish that the commercial activity exception applies under that clause for the reasons discussed previously.

fully belonged to them. Because the Argentine government solicited reservations and accepted payment for the hotel in the United States, there was a "material connection ... between the [plaintiffs'] cause of action and the act performed in the United States." 965 F.2d at 709. Here, in contrast, there is no such connection. Consequently, the second clause of 28 U.S.C. § 1605(a)(2) does not apply.

### 3. Clause Three

■■■ The commercial activity exception's third clause covers an action that "is based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). An effect is "direct" if it "follows as an *immediate* consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (emphasis added) (citation, internal quotation marks, and ellipsis omitted). An "immediate" consequence means that "no intervening act breaks 'the chain of causation leading from the asserted wrongful act to its impact in the United States.'" *Terenkian*, 694 F.3d at 1133 (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir.2001)).

■■■ In addition, the effect must be "more than 'purely trivial' or 'remote and attenuated.'" *Id.* at 1134 (quoting *Weltover*, 504 U.S. at 618, 112 S.Ct. 2160). Consideration of this factor requires courts to "look to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *Id.* (quoting *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir.1997)) (internal quotation marks omitted). A mere "tangential effect in the United States" from the defendant's act elsewhere "does not

constitute a 'direct effect' as contemplated in the third clause of § 1605(a)(2)." *Id.* (citations omitted).

■■■ According to Plaintiffs, Defendants' conduct has a direct effect in the United States because "[t]he illicit monies derived from the confiscation of lands is used to conduct business and operations here in the United States." (Opp'n at 6–7.) Clearly, however, the confiscation of land in Turkey nearly a century ago did not have *immediate* effects in the United States such that no intervening acts broke the chain of causation. The legally significant acts transpired in the Ottoman Empire and, later, the Republic of Turkey. Although these acts "may have had ripple effects in [the United States]," *Terenkian*, 694 F.3d at 1138, they are not, in themselves, sufficient to constitute a direct effect here. *See id.* (holding that "legally significant acts" or "direct effect" requirement was not met where Iraq's cancellation of a contract led to the "non-deposit of payments for oil in a New York bank").

Thus, none of the three clauses of 28 U.S.C. § 1605(a)(2) apply here and the commercial activity exception to sovereign immunity is not a possible basis for jurisdiction.

### B. *Expropriation Exception*

Under the "expropriation" or "international takings" exception, a foreign state is not immune from United States jurisdiction in any case

in which rights in property *taken in violation of international law* are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency

or instrumentality is engaged in a commercial activity in the United States.... 28 U.S.C. § 1605(a)(3) (emphasis added).

The sole issue in dispute as to the expropriation exception's application is whether Plaintiffs' property was taken in violation of international law. For a jurisdictional challenge to the pleadings under the FSIA, the Court "need not decide whether the taking *actually* violated international law; as long as a 'claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of ... jurisdiction.'" *Siderman de Blake*, 965 F.2d at 711 (emphasis added) (quoting *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 826 (9th Cir.1987)).

A taking contravenes international law if (1) it does not serve a public purpose; (2) it discriminates against or singles out aliens for regulation by the state; or (3) the foreign government does not pay just compensation. *Altmann v. Republic of Austria*, 317 F.3d 954, 968 (9th Cir.2002) (citing *West*, 807 F.2d at 831–32), *aff'd on other grounds*, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); *see also Siderman de Blake*, 965 F.2d at 711–12 (explaining that "[t]hese well-established principles track the Restatement of Foreign Relations Law" and are in accord with the FSIA's legislative history). "If a taking violates any one of the aforementioned proscriptions, it violates international law." *Siderman de Blake*, 965 F.2d at 712.

The expropriation exception to sovereign immunity normally does not apply, however, "where the plaintiff is a citizen of the defendant country at the time of the expropriation, because '[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.'" *Id.* at 711 (quoting *Chuidian*, 912 F.2d at 1105); *see also Cassirer*, 616 F.3d at 1023 n. 2

("Citizenship matters because we have held that the takings exception, at issue here, does not apply where the plaintiff is a citizen of the country that expropriates his property." (citing *Chuidian* )); *Altmann*, 317 F.3d at 968 (quoting *Siderman* ). Relying on this quartet of cases–*Cassirer, Altmann, Siderman*, and *Chuidian* –Defendants contend that Plaintiffs (or their predecessors in interest) were citizens of the Ottoman Empire when their property was expropriated and therefore cannot invoke the takings exception. (Mot. at 57.)

### 1. The Armenians Whose Property Was Taken Were Citizens of the Ottoman Empire

In cases such as this, where some or all of the plaintiffs are heirs or successors-in-interest, the relevant citizenship is that of the persons whose property was taken. *See, e.g., Cassirer*, 616 F.3d at 1023 & n. 2 (considering the citizenship of the plaintiff's grandmother, whose painting was expropriated by the German government in 1939).

Citizenship in the late Ottoman Empire was governed by the Law of Nationality of January 19, 1869, which treated all persons found within the Ottoman Empire as Ottoman subjects:

> Every person inhabiting the imperial dominions is considered as an Ottoman subject and treated as an Ottoman subject. If he (or she) is a foreign subject it is necessary for him (or her) to prove it in a regular manner.

Law of Nationality of 1869, art. 9, *reprinted and translated in A Collection of Nationality Laws of Various Countries as Contained in Constitutions, Statutes and Treaties* 569 (Richard W. Flournoy, Jr. & Manley O. Hudson eds., 1929) [hereinafter Flournoy & Hudson].[10]

---

10. The bank defendants reproduce this page in Exhibit A to the declaration of Christopher P. Murphy [Doc. # 42–1].

There were two main reasons for this law. First, the Ottoman government sought to crack down on abuses of existing nationality laws. In the eighteenth and early nineteenth centuries, many Ottoman subjects who were not in the foreign diplomatic or consular service were nonetheless "protected" by foreign consulates. These so-called *protégés* were treated by the Ottoman government effectively as foreign subjects in all civil and criminal actions. U.S. Dep't of State, *Papers Relating to the Foreign Relations of the United States with the Address of the President to Congress December 2, 1913*, at 1331 (1920). The practice was widespread; certain port cities contained more *protégés* than Ottoman subjects. *Id.* The Sublime Porte, which had become increasingly frustrated with the situation, severely curtailed the protégé system in an 1860 law that allowed only a limited period of protection for a limited number of consular employees. *Id.* at 133132.

In addition, a growing sense of Turkish nationalism in the latter half of the nineteenth century led to a new conception of citizenship. Before 1869, religion determined nationality and foreigners could not obtain Turkish nationality without embracing Islam. Flournoy & Hudson, *supra*, at 568. The 1869 nationality law was enacted as part of a general attempt by the Ottoman government to replace religious affiliation with secular identity. It "reinforced the principle that all individuals living within Ottoman domains shared a common citizenship regardless of their religion." Cleveland & Burton, *supra*, at 83. As relevant here, the 1869 Law of Nationality remained in effect until May 23, 1927,[11] when Law No. 1041 stripped Turkish citizenship from the Armenians who had fled or were deported from the Empire during the events at issue in this lawsuit.[12] *See* Flournoy & Hudson, *supra*, at 567, 569.

■ From the foregoing, it is clear that ethnic Armenians living in the Ottoman Empire during the events giving rise to this lawsuit were Ottoman citizens. At the hearing, Plaintiffs asserted that the ethnic Armenians living in the Ottoman Empire were treated as *de facto* non-citizens in the same way as Jews living in Nazi-era Germany. The German Jews, however, had been stripped of their citizenship as a result of the Reichsbürgergesetz [Reich Citizenship Law], Sept. 15, 1935, RGB1. 1, at 1146. *See generally* Richard J. Evans, *The Third Reich in Power* 544 (2005) ("The Reich Citizenship Law defined citizens of the Reich exclusively as people of 'German or kindred

---

**11.** The Turkish constitution of 1924 contained some provisions related to citizenship, most notably that "Turkish citizenship may be forfeited or lost in certain circumstances specified by law." Turk. Const., art. 88 (1924), *reprinted and translated in* Edward Mead Earle, *The New Constitution of Turkey*, 40 Pol. Sci. Q. 73, 98 (1925). In addition, a 1923 convention between Turkey and Greece provided that "emigrants," *i.e.*, "persons who have been obliged to emigrate or have emigrated since October 18, 1912," would lose the nationality of the country they were leaving and acquire the nationality of their destination country upon arrival. Convention Concerning the Exchange of Greek and Turk-ish Populations, and Protocol, Greece–Turk., Jan. 30, 1923, 32 L.N.T.S. 75. The 1924 constitution was not effective until after the time period at issue in this action, and the 1923 convention—to the extent it affected any potential class members or their predecessors in interest—did not divest emigrants of citizenship until after they had already left the country and, presumably, their property had been confiscated.

**12.** Law No. 1041 applied to "Ottoman subjects who during the War of Independence took no part in the National movement, kept out of Turkey and did not return from July 24, 1923 to the date of the publication of this law." Flournoy & Hudson, *supra*, at 569.

blood.' ... [T]he Jews ... were merely 'subjects of the state.' They had 'obligations towards the Reich' but were given no political rights in return."). Legally, Armenians whose property was taken and who were deported from the Ottoman Empire were citizens at the time.

### 2. Plaintiffs Nonetheless Allege a Violation of International Law

The question remains whether Plaintiffs' allegations raise a substantial and non-frivolous claim that the Ottoman government's treatment of its own citizens violated international law, thus falling within the FSIA's expropriation exception. The Ninth Circuit has addressed this issue only four times—in *Cassirer, Altmann, Siderman,* and *Chuidian.* In all of these cases, the discussion was cursory. *Chuidian,* the first case in the Ninth Circuit to address the issue, merely states that "[e]xpropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law." 912 F.2d at 1105. For this unexamined proposition, it cites two out-of-circuit cases: *de Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385 (5th Cir.1985), and the pre-FSIA case of *Dreyfus v. Von Finck,* 534 F.2d 24 (2d Cir.1976).

In *Dreyfus,* the Second Circuit interpreted the Alien Tort Statute, 28 U.S.C. § 1350, which in relevant part creates jurisdiction in the district courts over "any civil action by an alien for a tort ... committed in violation of the law of nations," *i.e.,* international law. 534 F.2d at 31. In a section of *Dreyfus* described by the Second Circuit four years later as "dicta," *Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2d Cir.1980), that court opined that "violations of international law do not occur when the aggrieved parties are nationals of the acting state." *Dreyfus,* 534 F.2d at 31. The Second Circuit emphatically repudiated this view in *Filartiga,* holding that the *Dreyfus* dicta "is clearly out of

tune with the current usage and practice of international law. [Various] treaties and accords ..., as well as the express foreign policy of our own government, all make it clear that international law confers fundamental rights upon all people vis-a-vis their own governments." 630 F.2d at 884–85 (footnote omitted).

*de Sanchez* similarly recognized that the citizenship rule is not absolute. Interpreting the FSIA's international takings exception, the Fifth Circuit reiterated the general rule that international law recognizes injuries to individuals "only where they implicate two or more different nations." *de Sanchez,* 770 F.2d at 1396 (citing *Dreyfus,* 534 F.2d at 31). The court noted, however, that the "traditional dichotomy between injuries to states and to individuals—and between injuries to home-grown and to alien individuals—has begun to erode." *Id.* at 1396–97. It explained that under a then-emerging conception of universal human rights, "international law sets a minimum standard not only for the treatment of aliens but also for the treatment of human beings generally." *Id.* at 1397. Nevertheless, the Fifth Circuit cautioned that

> the standards of human rights that have been generally accepted—and hence incorporated into the law of nations—are still limited. They encompass only such basic rights as the right not to be murdered, tortured, or otherwise subjected to cruel, inhuman or degrading punishment; the right not to be a slave; and the right not to be arbitrarily detained.

*Id.* (citing *Filartiga,* 630 F.2d at 884–85).

*Chuidian,* the seminal case in the Ninth Circuit, did not involve any such contravention of human rights. Rather, it arose when an official of the new Philippine government under Corazon Aquino instructed a Philippine bank not to make payment on a letter of credit issued by former Philip-

pine president Ferdinand Marcos. See *Chuidian*, 912 F.2d at 1097–98. Thus, *Chuidian* had no reason to comment on the existence and nature of the citizenship rule's exceptions. Similarly, *Siderman* appropriately invoked the citizenship rule because the international law violation in that case—torture—was not integrally related to the Argentine government's expropriation of the plaintiffs' property.[13] *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 676–67 (7th Cir.2012); *see also* Cooper–Hill, *supra*, at 115 ("The expropriation claims . . . [in *Siderman* ] based on commercial activity in the [United States] are not relevant to the claim of *jus cogens* based on torture.").

It is settled in the Ninth Circuit that genocide violates international law. *See Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 759 (9th Cir.2011) (*en banc* ) ("Claims of genocide, therefore, fall within the limited category of claims constituting a violation of internationally accepted norms for [Alien Tort Statute] jurisdiction."), *petition for cert. filed*, 81 USLW 3028, 81 USLW 3595, 81 USLW 3598, 80 USLW 3335, —— U.S. ——, 133 S.Ct. 1995, 185 L.Ed.2d 863 (Nov. 23, 2011); *Siderman de Blake*, 965 F.2d at 715 ("The universal and fundamental rights of human beings identified by Nuremberg—rights against genocide, enslavement, and other inhumane acts—are the direct ancestors of the universal and fundamental norms recognized as *jus cogens* . . . . Because *jus cogens* norms do not depend solely on the consent of states

for their binding force, they enjoy the highest status within international law." (citations and internal quotation marks omitted)). Indeed, as the Seventh Circuit recently observed, "[a]ll U.S. courts to consider the issue recognize genocide as a violation of customary international law." *Abelesz*, 692 F.3d at 675 (citations omitted).

In *Abelesz*, the Seventh Circuit was faced with the same question before this Court: whether a state's systematic expropriation of its nationals' property in conjunction with an overall alleged genocidal scheme can establish jurisdiction under the FSIA's international takings exception. The Seventh Circuit concluded that it could.

Genocide . . . can be an expensive proposition. Expropriating property from the targets of genocide has the ghoulishly efficient result of both paying for the costs associated with a systematic attempt to murder an entire people and leaving destitute any who manage to survive. The expropriations alleged by plaintiffs in these cases—the freezing of bank accounts, the straw-man control of corporations, the looting of safe deposit boxes and suitcases brought by Jews to the train stations, and even charging third-class train fares to victims being sent to death camps—should be viewed, at least on the pleadings, as an integral part of the genocidal plan to depopulate Hungary of its Jews. The expropriations

---

13. Although the claims in both *Altmann* and *Cassirer*—involving property taken by the Nazis during the genocidal Third Reich—*were* contextually analogous to the claims here, the citizenship rule's perfunctory and uncritical mention in those cases does not bind this Court. "Statements made in passing, without analysis, are not binding precedent." *M.M. v. Lafayette Sch. Dist.*, 681 F.3d 1082, 1088 (9th Cir.2012) (quoting *Thacker v. FCC (In re Magnacom Wireless, LLC)*, 503 F.3d 984, 993–94 (9th Cir.2007)) (brackets and internal quota-

tion marks omitted). In *Cassirer*, the Holocaust victim's citizenship was "not challenged on appeal." *Cassirer*, 616 F.3d at 1023 n. 2. In *Altmann*, the panel applied the regular international takings analysis because the victim was not a German citizen. *See Altmann*, 317 F.3d at 968. Thus, the panel had no need to consider whether, had the victim been a German citizen at the time of the expropriation, the property theft's relation to the overall genocide would independently satisfy 28 U.S.C. § 1605(a)(3).

thus effectuated genocide in two ways. They funded the transport and murder of Hungarian Jews, and they impoverished those who survived, depriving them of the financial means to reconstitute their lives and former communities.

\* \* \*

The international norm against genocide is specific, universal, and obligatory. Where international law universally condemns the ends, we do not believe the domestic takings rule can be used to require courts to turn a blind eye to the means used to carry out those ends–in this case, widespread expropriation of victims' property to fund and accomplish the genocide itself. Plaintiffs' allegations of these expropriations as an integral part[ ] of the overall genocidal plan allege violations of international law notwithstanding the domestic takings rule that would apply in most other circumstances.

*Abelesz*, 692 F.3d at 675.

▮ Here, the allegations of the complaint are essentially the same–that the Ottoman Empire and later the Republic of Turkey stripped ethnic Armenians of their property and that these expropriations were integrally related to the government-sanctioned genocidal policies. (*See* Compl. ¶¶ 39–43.) Consequently, this case likewise involves "rights in property taken in violation of international law," 28 U.S.C. § 1605(a)(3), and the FSIA's international takings exception precludes Defendants from invoking the protective cloak of sovereign immunity at the pleadings stage.

## C. *The Complaint Presents a Nonjusticiable Political Question*

▮ Finding that the FSIA does not necessarily prevent this action from proceeding in this forum does not end the jurisdictional inquiry, however, because the Court must still assure itself that Plaintiffs' claims would not require adjudi-

cation of a nonjusticiable political question. Although the bank defendants raise this issue in their motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), it is in fact an issue of subject matter jurisdiction under Rule 12(b)(1). *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir.2007).

▮ "In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, —— U.S. ——, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821)). One narrow exception is the "political question" doctrine. "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative [branches] ... and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." *Corrie*, 503 F.3d at 982 (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918)) (internal quotation marks omitted).

▮ Not "every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)) (internal quotation mark omitted). A political question does not exist merely because a court's resolution of a case "may have significant political overtones." *Id.* (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)). In *Baker*, the Supreme Court set forth six considerations when determining whether to refrain from adjudicating a case in deference to the political branches:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a

coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. 691.

As discussed above, to establish subject matter jurisdiction under the FSIA, Plaintiffs must prove that the actions of the Republic of Turkey and its predecessor state, the Ottoman Empire, amounted to "genocide," because only that type of egregious conduct would violate international law. Turkey does not view its actions towards ethnic Armenians nearly a century ago to be fairly characterized as such. *See Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1076–77 (9th Cir.2012).

In *Movsesian*, the Ninth Circuit considered a California statute that dramatically extended the limitations period for "Armenian Genocide" victims and their heirs to bring claims for insurance benefits under policies issued or in effect in the Ottoman Empire between 1875 and 1923. *See id.* at 1070. The panel held that the state statute was preempted because it impermissibly intruded on the exclusively federal power to administer foreign affairs. *Id.* at 1077. Specifically, the statute expressed "a distinct political point of view on a specific matter of foreign policy" by "impos[ing] the politically charged label of 'genocide' on the actions of the Ottoman Empire (and, consequently, present-day Turkey) and express[ing] sympathy for

'Armenian Genocide victim[s].'" *Id.* at 1076.

*Movesian* found particularly troubling the fact that the statute's jurisdictional grant would require courts to determine whether the claim was brought by an "Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim." *Id.* (quoting Cal.Civ.Proc.Code § 354.4(b)) (internal quotation marks omitted). The statute defined "Armenian Genocide victim" to mean "any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period." *Id.* (quoting Cal.Civ.Proc.Code § 354.4(a)(1)) (internal quotation mark omitted). The provision thus would require courts "to decide whether the policyholder 'escaped to avoid persecution,' which in turn would require a highly politicized inquiry into the conduct of a foreign nation." *Id.* (internal citations omitted). As the statute at issue had "a direct impact upon foreign relations and may well [have] adversely affect[ed] the power of the central government to deal with those problems," it impermissibly "intrude[d] on the federal government's exclusive power to conduct and regulate foreign affairs." *Id.* at 1077 (quoting *Zschernig v. Miller*, 389 U.S. 429, 441, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968)) (internal quotation marks omitted).

The passage of nearly a century since the events in question has not extinguished the potential effect of [the state statute] on foreign affairs. On the contrary, *Turkey expresses great concern over the issue, which continues to be a hotly contested matter of foreign policy around the world. See, e.g., Turkey retaliates over French 'genocide' bill*, BBC, Dec. 22, 2011 (reporting that the Turkish prime minister announced measures against France after the

French National Assembly passed a bill criminalizing denial of the "Armenian Genocide"); Peter Baker, *Obama Marks Genocide Without Saying the Word*, N.Y. Times, Apr. 25, 2010, at A10 (noting that President Obama was careful to avoid using the word "genocide" during a commemorative speech in an attempt to "avoid alienating Turkey, a NATO ally, which adamantly rejects the genocide label").

*Id.* (emphasis added).

■ The situation presented in this case is not materially different than the issue in *Movesian.* In either case, allowing the lawsuit to proceed would involve judicial interference in foreign relations—here because establishing that "genocide" occurred is a jurisdictional prerequisite. In light of the political question doctrine and analogous Ninth Circuit precedent, this Court cannot resolve such an inherently political question that our Constitution reserves for the other two coordinate branches of government. Therefore, this lawsuit must be dismissed.

Because the Court concludes that it lacks subject matter jurisdiction to hear this dispute, it does not reach the bank defendants' alternative grounds for judgment on the pleadings, including (1) the act of state doctrine; (2) foreign affairs preemption; (3) international comity; (4) a failure to show a right to relief; and (5) the statute of limitations. (*See* Mot. at 1-2.)

## IV.

### CONCLUSION

Based on the foregoing, the bank defendants' motion to dismiss is GRANTED, the Republic of Turkey's default, entered by the Clerk of Court on October 11, 2011 [Doc. # 44], is VACATED, and this action is DISMISSED without prejudice. The

bank defendants' motion to consolidate cases is DENIED as moot.

IT IS SO ORDERED.

