**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VAZKEN MOVSESIAN; HARRY
ARZOUMANIAN; GARO AYALTIN;
MIRAN KHAGERIAN; ARA
KHAJERIAN, individually and on
behalf of all others similarly
situated including thousands of
senior citizens, disabled persons,
and orphans as well as on behalf
of the general public and acting in
the public interest,
          *Plaintiffs-Appellees,*

    v.

VICTORIA VERSICHERUNG AG, a
German corporation; ERGO
VERSICHERUNGSGRUPPE AG, a
German corporation,
          *Defendants,*

    and

MUNCHENER RUCKVERSICHERUNGS-
GESELLSCHAFT AKTIENGESELLSCHAFT
AG, a German corporation,
          *Defendant-Appellant.*

No. 07-56722

D.C. No.
CV-03-09407-
CAS-JWJ

OPINION

Appeal from the United States District Court
for the Central District of California
Christina A. Snyder, District Judge, Presiding

Argued and Submitted
December 14, 2011—San Francisco, California

Filed February 23, 2012

2009

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder, Stephen Reinhardt, Sidney R. Thomas, Barry G. Silverman, Susan P. Graber, M. Margaret McKeown, Raymond C. Fisher, Richard A. Paez, Johnnie B. Rawlinson, and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Graber

**COUNSEL**

Neil M. Soltman, Mayer Brown LLP, Los Angeles, California, for the defendant-appellant.

Kathryn Lee Boyd, Schwarcz, Rimberg, Boyd & Rader, LLP, Los Angeles, California; Mark J. Geragos, Geragos & Geragos, APC, Los Angeles, California; and Richard L. Kellner,

Kabateck Brown Kellner LLP, Los Angeles, California, for the plaintiffs-appellees.

David M. Balabanian, Bingham McCutchen LLP, San Francisco, California; David Saltzman, Saltzman & Evinch, PC, Washington, D.C.; Marco Simons, Earthrights International, Washington, D.C.; Antonette Benita Cordero, Deputy Attorney General, Los Angeles, California; and Igor V. Timofeyev, Paul Hastings LLP, Washington, D.C., for the amici curiae.

**OPINION**

GRABER, Circuit Judge:

Section 354.4 of the California Code of Civil Procedure vests California courts with jurisdiction over certain insurance claims brought by "Armenian Genocide victim[s]" and extends the statute of limitations for such claims. Under that statute, individual Plaintiffs, including Vazken Movsesian, filed this class action against various insurers. One of the defendant insurance companies filed a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the claims, arguing, among other things, that section 354.4 is preempted under the foreign affairs doctrine. *See* U.S. Const. art. VI, cl. 2 (Supremacy Clause) ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."). We hold that section 354.4 is preempted and, accordingly, reverse the district court's contrary ruling.[1]

---

[1]Because we conclude that section 354.4 is preempted, we need not and do not reach any other issues.

FACTUAL AND PROCEDURAL HISTORY

In 2000, the California legislature enacted section 354.4, which provides that California courts may entertain various insurance claims brought by "Armenian Genocide victim[s]" arising out of policies issued or in effect between 1875 and 1923. The law also extends the statute of limitations for such claims. Section 354.4 reads in relevant part:

> (a) The following definitions govern the construction of this section:

> (1) "Armenian Genocide victim" means any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period.

> (2) "Insurer" means an insurance provider doing business in the state, or whose contacts in the state satisfy the constitutional requirements for jurisdiction, that sold life, property, liability, health, annuities, dowry, educational, casualty, or any other insurance covering persons or property to persons in Europe or Asia at any time between 1875 and 1923.

> (b) Notwithstanding any other provision of law, any Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim, who resides in this state and has a claim arising out of an insurance policy or policies purchased or in effect in Europe or Asia between 1875 and 1923 from an insurer described in paragraph (2) of subdivision (a), may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution.

(c) Any action, including any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim, whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923 shall not be dismissed for failure to comply with the applicable statute of limitation, provided the action is filed on or before December 31, 2010.[2]

In 2003, Movsesian and several other individuals filed this class action against Defendants Victoria Versicherung AG ("Victoria"), Ergo Versicherungsgruppe AG ("Ergo"), and Munchener Ruckversicherungs-Gesellschaft Aktiengesellschaft AG ("Munich Re"). Munich Re is the parent company of Victoria and Ergo. The class consists of persons of Armenian descent who claim benefits under Defendants' life insurance policies issued or in effect in the Ottoman Empire between 1875 and 1923.

Plaintiffs seek damages from Defendants on theories of breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and constructive trust. Plaintiffs rely on section 354.4 in order to bring their claims now. Munich Re moved to dismiss all claims, Fed. R. Civ. P. 12(b)(6), arguing that section 354.4 is unconstitutional because it violates the Due Process Clause of the 14th Amendment to the Constitution and because it is preempted under the foreign affairs doctrine. Munich Re also asserted that it is not a proper defendant and that the class members lack standing to bring claims under section 354.4.

The district court held that section 354.4 is not preempted under the foreign affairs doctrine. It also held that the class members have standing to bring their claims, that Munich Re

---

[2]In 2011, California revised the law to extend the statute of limitations under section 354.4(c) from December 31, 2010, to December 31, 2016.

is a proper defendant, and that section 354.4 does not violate the Due Process Clause. The court denied Munich Re's motion to dismiss the claims for breach of contract and breach of the covenant of good faith and fair dealing, but granted Munich Re's motion to dismiss the unjust enrichment and constructive trust claims.

Munich Re filed a motion to certify the district court's order for interlocutory appeal. The district court granted the motion and stayed the case. Munich Re timely petitioned this court for permission to pursue an interlocutory appeal, and we granted the petition. On appeal, the parties addressed three issues: (1) whether section 354.4 is preempted under the foreign affairs doctrine; (2) whether Munich Re is a proper defendant; and (3) whether the class members have standing to bring their claims. A three-judge panel affirmed. *Movsesian v. Victoria Versicherung AG*, 629 F.3d 901 (9th Cir. 2010). We then took this case en banc, thereby vacating the panel's opinion. *Movsesian v. Victoria Versicherung AG*, No. 07-56722, 2011 WL 5336269 (9th Cir. Nov. 7, 2011).

## STANDARD OF REVIEW

We review de novo the district court's decision on a Rule 12(b)(6) motion to dismiss. *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1072 (9th Cir. 2006). Similarly, we review de novo questions of law. *Id.*

## DISCUSSION

A.   *The Foreign Affairs Doctrine and Field Preemption*

**[1]** The Constitution gives the federal government the exclusive authority to administer foreign affairs. *See, e.g.*, *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("The Federal Government, representing

as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. . . . Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.").

**[2]** Under the foreign affairs doctrine, state laws that intrude on this exclusively federal power are preempted. Foreign affairs preemption encompasses two related, but distinct, doctrines: conflict preemption and field preemption. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418-20 (2003). Under conflict preemption, a state law must yield when it conflicts with an express federal foreign policy. *See id.* at 421 ("The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two."); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) ("The Supreme Court has declared state laws unconstitutional under the foreign affairs doctrine when the state law conflicts with a federal action such as a treaty, federal statute, or express executive branch policy."), *cert. denied*, 131 S. Ct. 3055 (2011).

**[3]** But the Supreme Court has made clear that, even in the absence of any express federal policy, a state law still may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs without addressing a traditional state responsibility. This concept is known as field preemption or "dormant foreign affairs preemption." *Deutsch v. Turner Corp.*, 324 F.3d 692, 709 n.6 (9th Cir. 2003).

**[4]** In *Pink*, 315 U.S. at 233, and *Hines*, 312 U.S. at 63, the Supreme Court recognized that the Constitution implicitly grants to the federal government a broad foreign affairs power. *See also Deutsch*, 324 F.3d at 709 ("Because the Con-

stitution mentions no general foreign affairs power, and because only a few specified powers related to foreign affairs are expressly denied the states, one might assume that, with certain exceptions, states are free to pursue their own foreign policies. This is not, however, the case. To the contrary, the Supreme Court has long viewed the foreign affairs powers specified in the text of the Constitution as reflections of a generally applicable constitutional principle that power over foreign affairs is reserved to the federal government.”). The existence of this general foreign affairs power implies that, even when the federal government has taken no action on a particular foreign policy issue, the state generally is not free to make its own foreign policy on that subject.

For example, in *Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968), the Supreme Court recognized that, even in the absence of any treaty, federal statute, or executive order, a state law may be unconstitutional if it “disturb[s] foreign relations” or “establish[es] its own foreign policy.” There, the Court considered the constitutionality of an Oregon probate law that imposed conditions under which aliens could receive Oregon property by succession or testamentary disposition. *Id.* at 430-31. The state statute provided for escheat unless the nonresident alien could demonstrate that the foreign country from which the alien came granted various reciprocal rights to United States citizens. *Id.*

The Oregon statute conflicted with no express policy of the federal government. *Id.* at 440-41. Indeed, the federal government’s amicus curiae brief stated: “The government does not contend that the application of the Oregon escheat statute in the circumstances of this case unduly interferes with the United States’ conduct of foreign relations.” *Id.* at 434 (internal quotation marks and ellipsis omitted).

But the absence of a conflict did not settle the question of preemption. Instead, the Court analyzed the purpose and operation of the Oregon statute to determine whether it constituted

an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Id.* at 432. In order for field preemption to apply, the Oregon law had to have "more than some incidental or indirect effect in foreign countries." *Id.* at 434 (internal quotation marks omitted).

The Court concluded that application of the Oregon law invited courts to conduct detailed inquiries into the political systems and conduct of foreign nations. *Id.* at 433-40. In applying the statute,

> the probate courts of various States have launched inquiries into the type of governments that obtain in particular foreign nations—whether aliens under their law have enforceable rights, whether the so-called "rights" are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations is credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.

*Id.* at 433-34. The application of the law therefore required value-laden judgments about the actions and policies of foreign nations and the credibility of foreign representatives. "As one reads the Oregon decisions, it seems that foreign policy attitudes, the freezing or thawing of the 'cold war,' and the like are the real desiderata. Yet they of course are matters for the Federal Government, not for local probate courts." *Id.* at 437-38 (footnote omitted). The Court also noted that "[s]uch attitudes are not confined to the Oregon courts," citing a number of decisions from other states expressing a desire to keep United States money out of the grasp of communist or authoritarian nations. *Id.* at 437 n.8.

Although the Oregon probate statute conflicted with no federal law and appeared, at first blush, simply to regulate

property—a traditional area of state responsibility—the Supreme Court held that the law was preempted under the foreign affairs doctrine. *Id.* at 440-41. "The statute as construed seems to make unavoidable judicial criticism of nations established on a more authoritarian basis than our own. It seems inescapable that the type of probate law that Oregon enforces affects international relations in a persistent and subtle way." *Id.* at 440.

**[5]** More than three decades later, in *Garamendi*, the Supreme Court clarified when the application of the field preemption doctrine might be appropriate. There, the Court addressed the constitutionality of California's Holocaust Victim Insurance Relief Act of 1999 ("HVIRA"), which required any insurer doing business in California to disclose information about all policies it sold in Europe between 1920 and 1945. *Garamendi*, 539 U.S. at 401. Although the Court ultimately concluded that HVIRA was preempted because of a direct conflict with express federal policy, the Court also provided valuable insight into the doctrine of field preemption. The Court explained:

> The two positions [conflict preemption and field preemption] can be seen as complementary. If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. Where, however, a State has acted within what Justice Harlan called its "traditional competence," but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the

strength or the traditional importance of the state concern asserted.

*Id.* at 419 n.11 (citations omitted). With respect to HVIRA, the Court rejected the contention that the statute concerned a traditional state responsibility merely because it involved insurance. Noting the narrow scope of the statute and the nature of the legislative findings accompanying it, the Court observed that "there is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State." *Id.* at 426. Thus, *Garamendi* suggests that, under a field preemption analysis, when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect.

In *Von Saher*, we applied those principles to a California statute that extended the statute of limitations for civil actions to recover looted Holocaust-era artwork. After concluding that the statute, Cal. Civ. Proc. Code § 354.3, did not conflict directly with any express federal foreign policy, we conducted a thorough field preemption analysis and held the statute unconstitutional.

First, we addressed the question whether section 354.3 concerned an area of traditional state responsibility. *Von Saher*, 592 F.3d at 964-65. We acknowledged that the general subject area of the statute, the regulation of stolen property, is traditionally an area of state responsibility. *Id.* at 964. But we did not stop there. Instead, we inquired into the "real purpose" of the statute to determine whether it concerned an area of traditional state responsibility:

> Property, of course, is traditionally regulated by the state. But § 354.3 cannot be fairly categorized as a garden variety property regulation. Section 354.3 does not apply to all claims of stolen art, or even all

claims of art looted in war. The statute addresses only the claims of Holocaust victims and their heirs. Section 354.3(b).

Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs. *See, e.g.*, *Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws); *Crosby[ v. Nat'l Foreign Trade Council]*, 530 U.S. [363,] 367, 373 n.7 [(2000)] (rejecting purported state interest in taxing and spending); *Zschernig v. Miller*, 389 U.S. 429, 437-38 (1968) (rejecting purported state interest in regulating descent of property); *Deutsch*, 324 F.3d at 707 (rejecting purported state interest in procedural rules).

The *Garamendi* Court in dicta rejected the "traditional state interests" advanced by California in support of HVIRA, finding instead that the real purpose of the state law was the "concern for the several thousand Holocaust survivors said to be living in the state." *Garamendi*, 539 U.S. at 426. Though § 354.3 purports to regulate property, an area traditionally left to the states, like HVIRA, § 354.3's real purpose is to provide relief to Holocaust victims and their heirs.

*Von Saher*, 592 F.3d at 964 (parallel citations omitted). We concluded that, although the statute's goal of providing relief to Holocaust victims was laudable, "[i]n so doing, California can make 'no serious claim to be addressing a traditional state responsibility.' " *Id.* at 965 (quoting *Garamendi*, 539 U.S. at 419 n.11).

We then turned to the question whether section 354.3 intruded on a power expressly or impliedly reserved by the

Constitution to the federal government. *Id.* at 965-68. Section 354.3 attempted to provide redress for wartime wrongs, and "[t]he legislative findings accompanying the statute repeatedly reference the 'Nazi regime,' 'Nazi persecution,' and 'the many atrocities' the Nazis committed." *Id.* at 966. The application of the statute would often entail inquiry into the reparation efforts of foreign nations, which itself would involve an examination of underlying allegations of Nazi transgressions. *Id.* at 967. We ultimately concluded that section 354.3 intruded on the federal government's power to make and resolve war, holding that the federal government's failure to act did not "justify California's intrusion into a field occupied exclusively by the federal government." *Id.* at 965-68.

Field preemption is a rarely invoked doctrine. *Id.* at 963. Supreme Court jurisprudence makes clear, however, that field preemption may be appropriate when a state intrudes on a matter of foreign policy with no real claim to be addressing an area of traditional state responsibility. We followed that guidance in *Von Saher*, and we must follow it here.

B.   *The Constitutionality of Section 354.4*

Keeping in mind the principles that we have just articulated, we now address the constitutionality of section 354.4.

1.   *Section 354.4 does not concern an area of traditional state responsibility.*

**[6]** Plaintiffs argue that section 354.4 concerns an area of traditional state responsibility because it regulates insurance. But, as we noted in *Von Saher*, the required inquiry cannot begin and end, as Plaintiffs suggest, with the area of law that the state statute addresses. 592 F.3d at 964-65. On the contrary, we must look further to determine the "real purpose of the state law." *Id.* at 964; *see also Garamendi*, 539 U.S. at 425-26 (rejecting purported state interest in regulating insurance business and blue sky laws, and concluding that the real

purpose of the statute was to provide redress for Holocaust victims); *Von Saher*, 592 F.3d at 964 ("Though § 354.3 purports to regulate property, an area traditionally left to the states, like HVIRA, § 354.3's real purpose is to provide relief to Holocaust victims and their heirs."); *cf. Zschernig*, 389 U.S. at 440 ("The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy.").

**[7]** Here, the text and legislative history of section 354.4 leave no doubt that the law "cannot be fairly categorized as a garden variety" insurance regulation. Von Saher, 592 F.3d at 964. Section 354.4 is *not* a neutral law of general application. It applies only to a certain class of insurance policies (those issued or in effect in Europe and Asia between 1875 and 1923) and specifies a certain class of people ("Armenian Genocide" victims and their heirs) as its intended beneficiaries. *See Garamendi*, 539 U.S. at 425-26 ("But, quite unlike a generally applicable 'blue sky' law, HVIRA effectively singles out only policies issued by European companies, in Europe, to European residents, at least 55 years ago. Limiting the public disclosure requirement to these policies raises great doubt that the purpose of the California law is an evaluation of corporate reliability in contemporary insuring in the State." (citations omitted)). And, just as in *Garamendi*, the legislative findings accompanying the statute plainly reveal its true purpose.[3] *See* S. 1915 § 1(c), 1999-2000 Reg. Sess. (Cal. 2000) ("It is the specific intent of the Legislature to ensure that Armenian Genocide victims and their heirs be permitted to have an expeditious, inexpensive, and fair forum in which to resolve their claims . . . ."); *Garamendi*, 539 U.S. at 426 ("Indeed, there is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand

---

[3]We need not and do not decide how courts might determine the real purpose of a statute when that purpose is not apparent from the legislative findings and scope of the statute.

Holocaust survivors said to be living in the State. § 13801(d) (legislative finding that roughly 5,600 documented Holocaust survivors reside in California).").

**[8]** Thus, it is clear that the real purpose of section 354.4 is to provide potential monetary relief and a friendly forum for those who suffered from certain foreign events.[4] This is precisely the same purpose underlying HVIRA, the statute held unconstitutional in *Garamendi*, and section 354.3, the state law held preempted in *Von Saher*. As *Garamendi* and *Von Saher* make clear, that goal, however laudable it may be, "is not an area of 'traditional state responsibility,' and the statute is therefore subject to a field preemption analysis." *Von Saher*, 592 F.3d at 965; *see also Garamendi*, 539 U.S. at 425-26 (noting the weakness of the state's interest in vindicating the insurance claims of Holocaust survivors). In sum, section 354.4 does not concern an area of traditional state responsibility.

2.   *Section 354.4 intrudes on the federal government's foreign affairs power.*

We turn, finally, to the question whether section 354.4 intrudes on a power expressly or impliedly reserved to the federal government. We conclude that section 354.4 intrudes on the federal government's exclusive power to conduct and regulate foreign affairs.

**[9]** Section 354.4 has "more than some incidental or indirect effect" on foreign affairs. *Zschernig*, 389 U.S. at 434. The statute expresses a distinct political point of view on a specific matter of foreign policy. It imposes the politically charged

---

[4]We express neither agreement nor disagreement with the California legislature's viewpoint. We simply observe that California's main goal in enacting section 354.4 was to provide redress for individuals who were, in its view, victims of a foreign genocide, and that that goal falls outside the realm of traditional insurance regulation.

label of "genocide" on the actions of the Ottoman Empire (and, consequently, present-day Turkey) and expresses sympathy for "Armenian Genocide victim[s]." Cal. Civ. Proc. Code § 354.4. The law establishes a particular foreign policy for California—one that decries the actions of the Ottoman Empire and seeks to provide redress for "Armenian Genocide victim[s]" by subjecting foreign insurance companies to lawsuits in California. *See id.*; *Zschernig*, 389 U.S. at 441 (holding that, even in the absence of a conflicting federal policy, a state may violate the constitution by "establish[ing] its own foreign policy").

Furthermore, the statute's jurisdictional grant is predicated on a determination that the claim is brought by an "Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim." Cal. Civ. Proc. Code § 354.4(b). " 'Armenian Genocide victim' means any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period." *Id.* § 354.4(a)(1). Courts applying this provision may therefore have to decide whether the policyholder "escaped to avoid persecution," *id.*, which in turn would require a highly politicized inquiry into the conduct of a foreign nation, *see Zschernig*, 389 U.S. at 435-36 (finding preempted an Oregon statute that invited courts to engage in highly politicized analysis of foreign nations' governments and conduct).

The passage of nearly a century since the events in question has not extinguished the potential effect of section 354.4 on foreign affairs. On the contrary, Turkey expresses great concern over the issue, which continues to be a hotly contested matter of foreign policy around the world. *See, e.g.*, *Turkey retaliates over French 'genocide' bill*, BBC, Dec. 22, 2011 (reporting that the Turkish prime minister announced measures against France after the French National Assembly passed a bill criminalizing denial of the "Armenian Genocide"); Peter Baker, *Obama Marks Genocide Without Saying*

*the Word*, N.Y. Times, Apr. 25, 2010, at A10 (noting that President Obama was careful to avoid using the word "genocide" during a commemorative speech in an attempt to "avoid alienating Turkey, a NATO ally, which adamantly rejects the genocide label").

**[10]** In conclusion, section 354.4 expresses a distinct point of view on a specific matter of foreign policy. Its effect on foreign affairs is not incidental; rather, section 354.4 is, at its heart, intended to send a political message on an issue of foreign affairs by providing relief and a friendly forum to a perceived class of foreign victims. Nor is the statute merely expressive.[5] Instead, the law imposes a concrete policy of redress for "Armenian Genocide victim[s]," subjecting foreign insurance companies to suit in California by overriding forum-selection provisions and greatly extending the statute of limitations for a narrowly defined class of claims. Thus, section 354.4 "has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." *Zschernig*, 389 U.S. at 441. Section 354.4 therefore intrudes on the federal government's exclusive power to conduct and regulate foreign affairs.

## CONCLUSION

**[11]** Because California Code of Civil Procedure section 354.4 does not concern an area of traditional state responsibility and intrudes on the field of foreign affairs entrusted exclusively to the federal government, we hold that section 354.4 is preempted. We remand the case to the district court with instructions to dismiss all claims revived by that statute.

REVERSED and REMANDED with instructions.

---

[5]We need not and do not offer any opinion about California's ability to express support for Armenians by, for example, declaring a commemorative day.