

NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>SELIM AYKIRAN,<br><br>               Debtor. | BAP No. NC-21-1134-TFG<br><br>Bk. No. 19-42425 |
| TERRY KWONG,<br>               Appellant,<br>v.<br>SELIM AYKIRAN,<br>               Appellee. | Adv. No. 19-4068<br><br>**MEMORANDUM**[1] |

Appeal from the United States Bankruptcy Court
for the Northern District of California
Roger L. Efremsky, Bankruptcy Judge, Presiding

Before: TAYLOR, FARIS, and GAN, Bankruptcy Judges

## INTRODUCTION

Creditor Terry Kwong appeals from the bankruptcy court's dismissal

with prejudice of his §§ 523 and 727[2] claims against debtor Selim Aykiran

and the resulting judgment. We AFFIRM the dismissal of the

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

§§ 523(a)(2)(A), 523(a)(6), and 727(a)(2)(B) claims, VACATE the judgment
and the dismissal of the §§ 727(a)(2)(A), (a)(3), (a)(4)(a), and (a)(5) claims,
and REMAND with instructions to dismiss the §§ 727(a)(2)(A), (a)(3),
(a)(4)(a), and (a)(5) claims with leave to amend.

## FACTS[3]

### A. The business venture

Prepetition, Aykiran manufactured towels and related products
("Turkish Towels") in Turkey and then sold them in the United States. He
conducted this business using several corporate forms, including a Turkish
company—Turkish Towel Classic Tekstil Kolleksiyon Ltd. ("Classic")—and
three California limited liability companies—Turkish Towel Collection-
Classic S.A., LLC ("Collection"), Turkish Towel Collection S.A., LLC ("TT
Collection"), and Turkish Towel Classic Textile LLC ("Textile") (collectively
the "Entities").

In 2014, after discussing joint business opportunities, Kwong paid
Aykiran $537,140.50 to fund Aykiran's business. He did so based on
Aykiran's allegedly false representations that: (1) Aykiran was Classic's
sole owner; (2) Classic owned a factory; (3) the factory could manufacture
large quantities of high-quality Turkish Towels; (4) Classic qualified for

---

[3] The factual recitation is derived generally from Kwong's complaints, documents
attached to his complaints, and matters of which we may take judicial notice. We
exercise our discretion to take judicial notice of documents filed in the underlying
adversary proceeding, where appropriate. *See Atwood v. Chase Manhattan Mortg. Co. (In
re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

expense reimbursements from the Turkish government; (5) he was an established businessman; and (6) he had the intent and ability to repay any funds advanced (collectively, the "Misrepresentations").

## B. The written Agreement

Later that year, the parties executed a written agreement (the "Agreement"), which granted Kwong and his then-owned[4] company, First Son Trading Ltd. ("First Son"), substantial control over Aykiran's business. Under the Agreement, First Son would be the sole buyer of Turkish Towels from Classic and its affiliates and would dictate Turkish Towels production. Further, all Turkish Towels sales by Aykiran or Classic would require Kwong's approval.

The Agreement also provided that Kwong's $537,140.50 payment would be treated as a loan (the "Loan"), repayable from gross revenues of Turkish Towels sales. Related, it provided that, after repayment of the Loan, net profits for First Son, Classic, and TT Collection would be split between First Son, on the one hand, and Aykiran, Classic, or TT Collection, on the other hand.

## C. Aykiran's post-Agreement actions

Aykiran did not repay the Loan. Instead, he took various actions and made various post-Agreement transfers with the alleged intent to hinder, delay, or defraud Kwong and his collection efforts.

First, Aykiran allegedly failed to provide Turkish Towels to First Son.

Second, he allegedly prevented Kwong's agent from observing factory operations.

Third, after Aykiran married Sharon D. Block, he allegedly transferred to Block and her company, SD Block Tekstil ("SD Block"), "rights and control" in the Entities ("Control") despite the previous grants to Kwong under the Agreement. For example, Block eventually became sole registered owner of the "Turkish Towel Collection" fictitious business name. In addition, Block allegedly used Classic to import her own line of Turkish products.

Fourth, Aykiran allegedly ceased operations and formally cancelled TT Collection so its net profits could not be split with First Son after repayment of the Loan and then registered Textile to conduct sales in the United States.[5]

And fifth, Block established SD Block with the alleged intent and purpose of hindering and defrauding Aykiran's creditors. SD Block sells its own line of Turkish Towels from Textile's location.

Kwong claims that through these actions Aykiran diverted and dissolved the means and sources from which he could repay the Loan, diverted business profits, and put assets and profits out of the reach of his creditors.

---

[4] It is unclear whether Kwong still owns First Son.
[5] It is unclear whether Textile ever sold Turkish Towels.

**D. The state court action, bankruptcy, and adversary proceeding**

Kwong sued Aykiran in state court for damages related to Aykiran's failure to repay the Loan. Trial was set for January 2020, but Aykiran filed his chapter 7 petition before trial commenced.

Kwong responded with an adversary complaint against Aykiran, which he amended under Civil Rule 15(a), made applicable by Rule 7015, before effecting service. The first amended complaint (the "FAC") included claims to except debt from Aykiran's discharge under §§ 523(a)(2)(A) and (a)(6) and to deny him a discharge under §§ 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4)(a), and (a)(5).[6]

**1. The nondischargeability claims**

The FAC included two § 523(a)(2)(A) claims—one alleging that Aykiran obtained the Loan through the Misrepresentations (the "523(a)(2)(A) Loan claim") and the other alleging that Aykiran created debts to Kwong through his fraudulent transfer of Control in the Entities to Block and SD Block (the "523(a)(2)(A) Control claim"). And the FAC had two § 523(a)(6) claims—one alleging that the failure to repay the Loan caused willful and malicious injury to Kwong (the "523(a)(6) Loan claim") and the other alleging that Aykiran's transfer of Control in the Entities to Block and SD Block willfully and maliciously injured Kwong (the "523(a)(6) Control claim").

---

[6] The FAC also included claims against the Entities, Block, and SD Block and a § 523(a)(4) claim against Aykiran. Kwong eventually dismissed these claims.

**2. The denial of discharge claims**

Regarding the denial of discharge claims, the FAC claimed that Aykiran failed to disclose assets and liabilities in his bankruptcy schedules, made false statements in connection with the bankruptcy case, and failed to provide adequate books and records to the chapter 7 trustee.

**3. The dismissal of claims**

Aykiran filed a motion to dismiss the FAC for failure to state a claim for relief, citing Civil Rule 12(b)(6), made applicable by Rule 7012. Kwong opposed. At the hearing, the bankruptcy court dismissed all claims and granted Kwong leave to amend only the 523(a)(2)(A) Loan claim, the 523(a)(6) Loan claim, and the 523(a)(6) Control claim.

Kwong filed his second amended complaint (the "SAC"), which reasserted and supplemented his three remaining claims. Aykiran moved to dismiss the SAC under Civil Rule 12(b)(6). Following briefing and a hearing, the bankruptcy court dismissed the claims and granted Kwong leave to amend only the 523(a)(2)(A) Loan claim. Kwong later dismissed this claim with prejudice.

The bankruptcy court then entered judgment for Aykiran. Kwong appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1. Whether the bankruptcy court erred in dismissing Kwong's claims.

2. Whether the bankruptcy court abused its discretion in denying Kwong leave to amend.

## STANDARDS OF REVIEW

We review a bankruptcy court's grant of a Civil Rule 12(b)(6) motion to dismiss de novo. *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1071 (9th Cir. 2012). De novo review requires us to look at the matter anew, giving no deference to the bankruptcy court's determinations. *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

A dismissal without leave to amend is reviewed for abuse of discretion. *Willard v. Lockhart-Johnson (In re Lockhart-Johnson)*, 631 B.R. 38, 44 (9th Cir. BAP 2021). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or misapplies the correct legal standard or its factual findings are illogical, implausible, or without support from evidence in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

We may affirm on any ground fairly supported by the record. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1223 (9th Cir. 1999).

## DISCUSSION

Only the dismissals of the 523(a)(2)(A) and (a)(6) Control claims and

7

the §§ 727(a)(2)(A), (a)(3), (a)(4)(a), and (a)(5) claims are at issue.[7] As explained below, the bankruptcy court properly dismissed the claims, but it abused its discretion in denying leave to amend the § 727 claims.

## A. Dismissal of the 523(a)(2)(A) Control claim

Dismissal under Civil Rule 12(b)(6) is proper if the complaint fails to allege adequate facts to state a claim to relief that is facially plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A motion to dismiss "may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (quotation omitted).

Section 523(a)(2)(A) exempts from a debtor's discharge "any debt . . . for money, property, services, or . . . credit, to the extent *obtained by* . . . false pretenses, a false representation, or actual fraud." § 523(a)(2)(A) (emphasis added). That is, "it prevents discharge of any debt respecting money, property, services, or credit that the debtor has fraudulently obtained." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (cleaned up).

The 523(a)(2)(A) Control claim seeks to except from Aykiran's

---

[7] Kwong's statement of issues asserted error in the dismissals of these additional claims: (1) the 523(a)(2)(A) Loan claim to the extent that it alleges fraudulent transfers of Control in the Entities to Block and SD Block; (2) the 523(a)(6) Loan claim; and (3) the § 727(a)(2)(B) claim. We do not address these dismissals because the 523(a)(2)(A) Loan claim issues he articulates on appeal are identical to the 523(a)(2)(A) Control claim issues discussed below and because Kwong failed to provide any argument for error in the dismissal of his 523(a)(6) Loan claim and § 727(a)(2)(B) claim. *See Resorts Int'l, Inc. v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1402 (9th Cir. 1995) (issue included in statement of issues but not discussed in brief is considered waived).

discharge: (1) the Loan debt; and (2) nonspecific debt for lost profits. The claim fails because Kwong cannot possibly show that Aykiran fraudulently created these debts through his transfer of Control in the Entities to Block and SD Block.[8] We discuss each debt separately.

### 1. The Loan debt

Kwong relies heavily on *Husky International Electronics, Inc. v. Ritz*, 578 U.S. 356 (2016), to argue that the Loan debt is nondischargeable. In *Husky*, the Supreme Court reversed the Fifth Circuit's ruling that the "obtained by . . . actual fraud" language in § 523(a)(2)(A) requires a fraud that "involves a false representation to a creditor." 578 U.S. at 357. The Supreme Court held that "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Id*. at 359. While Kwong alleges Aykiran fraudulently transferred assets and that under *Husky* this suffices to save his § 523 claims from dismissal, he is wrong; *Husky* is distinguishable.

*Husky* is factually distinguishable because the bankruptcy debtor, unlike Aykiran, did not originally owe the debt at issue. Rather, a

---

[8] Aykiran argues that the 523(a)(2)(A) Control claim fails because it does not allege a transfer of property. Though unartfully plead, the claim seems to be alleging that he transferred intangible assets, such as books of business and ongoing business concerns, when he ceded Control in the Entities to Block and SD Block. Such assets may be the subject of fraudulent transfer claims. *See Exec. Benefits Ins. Agency v. Arkison (In re Bellingham Ins. Agency, Inc.)*, 702 F.3d 553, 571 (9th Cir. 2012). Thus, while Aykiran argues we need not decide whether he obtained a debt by his transfer of Control, we do.

corporation did. The bankruptcy debtor only later became potentially and partially liable for the debt under an applicable Texas veil-piercing statute when he "drained [the corporation] of assets it could have used to pay its debts to creditors[.]" *Id*. at 358.

And *Husky*'s holding is not nearly as broad as Kwong contends. The Supreme Court did not eliminate § 523(a)(2)(A)'s requirement that the money or property giving rise to the debt must have been "obtained by" false pretenses, a false representation, or actual fraud. Instead, it held that fraudulent schemes effected without misrepresentations—including fraudulent transfers of assets to hinder, delay, or defraud creditors—*may* satisfy the "obtained by" requirement in *some* cases. *Id*. at 365 (noting that "fraudulent conveyances are not wholly incompatible with the 'obtained by' requirement" of § 523(a)(2)(A), though "[s]uch circumstances may be rare"). It then remanded for a determination of whether the alleged fraudulent scheme satisfied the "obtained by" requirement. *Id*. at 365 n.3.

Thus, in *Husky*, fraudulent acts potentially *created* the debt at issue. *See id.* at 357. In contrast, Kwong alleges that Aykiran's fraudulent transfer of Control in the Entities to Block and SD Block somehow *transformed* Aykiran's preexisting Loan debt into a nondischargeable debt. Kwong's 523(a)(2)(A) Control claim, as to the Loan debt, fails regardless of whether Aykiran engaged in "actual fraud" because the Loan was not "obtained by" the alleged subsequent transfer of Control fraud.

10

## 2. The lost profits debt

Neither can the nonspecific lost profits debt arising from Aykiran's breach of the Agreement be said to be "obtained by" fraud. As the Supreme Court observed in *Husky*:

> [T]he transferor does not obtain debts in a fraudulent conveyance. But the recipient of the transfer—who, with the requisite intent, also commits fraud—can obtain assets by his or her participation in the fraud. If that recipient later files for bankruptcy, any debts traceable to the fraudulent conveyance will be nondischargeable under § 523(a)(2)(A).

*Id*. at 365 (cleaned up); *see also Quarré v. Saylor (In re Saylor)*, 178 B.R. 209, 213 (9th Cir. BAP 1995), *aff'd*, 108 F.3d 219 (9th Cir. 1997) (observing that it is unclear how a creditor's remedies for fraudulent transfer could create a right to payment from the transferor for purposes of nondischargeability, citing Cal. Civ. Code § 3439.07 (West 1994)). In this case, Aykiran was the transferor, but not the transferee, of the alleged fraudulent transfers. Thus, he did not obtain or create a lost profits debt by fraud as required by § 523(a)(2)(A).

Moreover, the 523(a)(2)(A) Control claim would fail even if a fraudulent transfer could create a right to payment against a transferor because Kwong would lack standing to pursue such payment. The lost profits debt would be owed to First Son—and not Kwong—under the terms of the Agreement, which provides that "[n]et profits for [Classic] shall be divided between *First Son* and [Classic]. Net profits for

11

[TT Collection] shall be divided between *First Son* and [TT Collection]." (emphasis added).

Furthermore, as the bankruptcy court properly determined, Kwong did not allege any factual matter to plausibly suggest that Aykiran's actions and "schemes" amounted to fraud. While Aykiran and Kwong's business venture failed, Kwong asserts no facts to suggest that Aykiran harbored ill intent or set out to harm Kwong. In fact, Kwong alleges that Aykiran spent the Loan funds on the Entities' business expenses. Such expenditures are inconsistent with an intent to hinder, delay, or defraud Kwong.

And finally, the 523(a)(2)(A) Control claim fails to plausibly assert lost profit damages. The damages are too speculative. Kwong does not attempt to allege any amount of profits that he could have reasonably expected to receive had he obtained Control in the Entities. It is implausible that he would have received any profit after repayment of the $537,140.50 Loan debt based on his allegations that: (1) Aykiran misrepresented ownership interests in the Entities and the factory, the factory's manufacturing capabilities, and his ability to obtain business expense reimbursements; and (2) Kwong would not have made the Loan had he known Aykiran's representations were false.

For the foregoing reasons, the bankruptcy court properly dismissed the 523(a)(2)(A) Control claim.

## B. Dismissal of the 523(a)(6) Control claim

The 523(a)(6) Control claim likewise seeks to except a lost profit debt

from Aykiran's discharge based on his transfer of Control in the Entities to Block and SD Block. It, too, fails.

The lost profit debt is a breach of contract debt. Debts resulting from intentional breaches of contract are not actionable under § 523(a)(6) unless the breaches were accompanied by tortious conduct that resulted in willful and malicious injury. *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1205 (9th Cir. 2001). To determine whether a breach of contract renders debt nondischargeable, a bankruptcy court employs a two-part test: first, it must determine if the debtor's conduct was tortious under state law, then it must determine if the debtor's conduct was also willful and malicious. *Lockerby v. Sierra*, 535 F.3d 1038, 1040-41 (9th Cir. 2008).

The 523(a)(6) Control claim does not satisfy the tortious conduct requirement. Fraud is unquestionably an intentional tort under California law. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974-75 (1997). Kwong, however, did not plausibly suggest that Aykiran's alleged actions rose above intentional breaches of the Agreement to the level of fraud. Thus, the bankruptcy court did not err in dismissing the claim.

## C. Dismissal of the § 727 claims

The bankruptcy court duly dismissed the § 727 claims as well. As we explain, they were too vague, scattershot, and contradictory to raise a right to relief above the speculative level on the assumption that all the allegations in the FAC were true.

**1. Transfers underlying the 523(a)(2)(A) and (a)(6) Control claims**

Kwong claims that the fraudulent transfers forming the basis of his 523(a)(2)(A) and (a)(6) Control claims justify a denial of discharge under § 727(a)(2)(A).[9] He is wrong. First, many of the transfers occurred well outside the one-year period. And second, for the reasons discussed above, he failed to plead sufficient plausible facts to establish fraud as to the activities.

**2. Nondisclosure of assets**

Kwong also claims Aykiran should be denied a discharge under §§ 727(a)(2)(A), 727(a)(4)(A),[10] and 727(a)(5)[11] based on alleged false statements and omissions in his bankruptcy schedules and statements.

But Kwong's factual allegations regarding Aykiran's business dealings undermine his § 727 claims. Specifically, Kwong alleges that Aykiran conducted his business through his Entities. If this is true, then the bulk of the assets allegedly omitted from the schedules—including inventory, equipment, machinery, website domain(s), business goodwill, investments, profits, PayPal accounts, a lawsuit against a Turkish individual, Block's investments, a vehicle lease, and rental deposits—

---

[9] Section 727(a)(2)(A) provides that a debtor may be denied a discharge if he, "with intent to hinder, delay, or defraud a creditor or [the bankruptcy trustee]," transferred or concealed his property during the year preceding the petition date.

[10] Section 727(a)(4)(A) provides that a debtor may be denied a discharge if he "knowingly and fraudulently, in or in connection with the case . . . made a false oath[.]"

[11] Section 727(a)(5) provides that a debtor may be denied a discharge if he "failed to explain satisfactorily, before determination of denial of discharge under this

would likely be the Entities' assets. And Aykiran's scheduling of an ownership interest in the Entities would sufficiently disclose his interests.

Consistent with this observation, Aykiran asserts that these assets were subsumed into his business valuations included in his Schedule B, line 19. Therein, he listed 100 percent and 70 percent ownership interests in Textile and Towel Classic Tekstil, respectively, valuing such interests at $0 and "unknown," respectively. He explained in his motion to dismiss the FAC, that the value of these businesses are $0 and "unknown" because either their liabilities exceed their assets or because their value is unknown. Kwong fails to sufficiently allege that these valuations are false or that Aykiran should have separately reported his business assets in his schedules.

The alleged undisclosed assets also include refunds and reimbursements from the Turkish government, which are presumably the Entities' assets, not Aykiran's assets. Kwong does not allege to the contrary. Further, it appears unlikely that these assets even exist, as Kwong alleges in the FAC that refunds and reimbursement requests were denied.

Even if any of the alleged undisclosed assets are Aykiran's personal assets, Kwong fails to allege what value, if any, they have. Such allegations are necessary to draw a reasonable inference that Aykiran should have scheduled the assets. Many of the assets are likely valueless. For example, Kwong vaguely alleges that Aykiran did not disclose "clothing." Likewise,

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"

15

he alleges that Aykiran did not disclose his interest in TT Collection. But elsewhere in the FAC, he alleges that Aykiran "cancelled" TT Collection over two years before filing bankruptcy. The FAC contains no allegations indicating that TT Collection or the clothing have any value and should have been disclosed because the omissions are material.

### 3. Nondisclosure of liabilities

As for liabilities, Kwong alleges that Aykiran failed to disclose debt to the Turkish government. But Kwong also alleges that businesses in Turkey are exposed to expensive long-term financial obligations. Such debt, then, logically belongs to the Entities and not Aykiran. There are insufficient allegations to suggest otherwise.

Similarly, while Kwong alleges that Aykiran did not disclose a promissory note in connection with his store's location and debts to his accountant/CPA, Block, and a third party, no details of the note or debts are given. It is thus unknown whether the note or debts belong to Aykiran individually or to his Entities.

### 4. Inadequate records

In addition, Kwong sought a discharge denial under § 727(a)(3) based on his allegations that Aykiran failed to produce records explaining why he stated a $0 value for Textile and only draws $1,000 per month from it. But again, Schedule B, line 19 discloses that Textile's liabilities exceed its assets. As such, it presumably has no value and cannot make distributions greater than $1,000. Kwong does not allege to the contrary.

16

### 5. False oaths

The alleged false statements forming the basis of Kwong's § 727(a)(5) claim include the above-described deficiencies in Aykiran's schedules. They also include Aykiran's § 341(a) meeting of creditors testimony that he stopped manufacturing Turkish Towels in 2014. Kwong alleges that this testimony is false and that Aykiran in fact ceased manufacturing Turkish Towels in 2018 or later. Kwong does not explain how the misrepresentation would merit a denial of discharge.

Based on the foregoing, the bankruptcy court properly dismissed Kwong's § 727 claims.

### D. Denial of leave to amend

We now address the bankruptcy court's denial of leave to amend.

Under Civil Rule 15, made applicable by Rule 7015, a bankruptcy court should grant leave to amend when justice so requires. It should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotation omitted).

In determining whether to grant a plaintiff leave to amend, a bankruptcy court should consider: (1) undue delay; (2) bad faith or dilatory motive by the plaintiff; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the defendant; and (5) futility of amendment ("*Foman* factors"). *Foman v. Davis*, 371 U.S. 178, 182 (1962). The consideration of prejudice to the defendant is paramount. *Eminence Cap.,*

17

*LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). "Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Id*.

**1. Denial of leave to amend the § 523 Control claims**

The bankruptcy court properly denied Kwong leave to amend the 523(a)(2)(A) Control claim because the problems with it are incurable. As we explained above, the claim is not just factually implausible. Rather, it suffers from legal impossibility; Kwong cannot prove under any set of facts that the alleged debts were obtained (created) by fraud.

Curiously, while the bankruptcy court properly denied leave to amend the 523(a)(2)(A) Control claim in the FAC, it granted Kwong leave to amend the 523(a)(6) Control claim. Kwong thereby had an opportunity to attempt to cure the deficiencies that pervaded his overlapping 523(a)(2)(A) and (a)(6) Control claims in his SAC. But the SAC was met with another successful motion to dismiss. The bankruptcy court properly denied Kwong a second opportunity to amend the 523(a)(6) Control claim because he could not prove that Aykiran's breach of the Agreement was accompanied by the tortious conduct alleged, fraud.

**2. Denial of leave to amend the § 727 claims**

But unlike the § 523 Control claims, we cannot conclude with certainty that the § 727 claims were doomed by legal impossibility to the extent that they were based on allegations other than the fraudulent transfer of Control in the Entities to Block and SD Block. The bankruptcy

18

court notably did not find that an amendment to the § 727 claims in the FAC would be futile, would cause undue delay, or would unduly prejudice Aykiran. Nor did it determine that Kwong asserted the § 727 claims in bad faith. As explained above, the § 727 claims could potentially be saved by amendment to the extent that they neither rely on the alleged fraudulent transfer of Control in the Entities to Block and SD Block nor relate to non-disclosure of non-estate assets. While the § 727 claims are undoubtably improbable, amendment would not necessarily be futile. Kwong should be afforded at least one opportunity to amend the claims to make them plausible. Thus, the bankruptcy court abused its discretion by denying leave to amend the § 727 claims.

## CONCLUSION

Thus, we AFFIRM the dismissal of the §§ 523(a)(2)(A), 523(a)(6), and 727(a)(2)(B) claims with prejudice, VACATE the judgment and the dismissal of the §§ 727(a)(2)(A), (a)(3), (a)(4)(a), and (a)(5) claims with prejudice, and REMAND with instructions to dismiss the §§ 727(a)(2)(A), (a)(3), (a)(4)(a), and (a)(5) claims with leave to amend.